[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Herb Holden Trucking Inc., a subcontractor, sues its general contractor, defendant Vinco Incorporated, in ten counts alleging breaches of contract and negligence and violation of Connecticut Unfair Trade Practices Act. However, since the latter count was not briefed by plaintiff, it will not be considered by the court. Jennings v. Reale Construction Co.,175 Conn. 16, fn. 1 at 17 (1978); Johnson v. Flammia, 169 Conn. 491,498 (1975). The defendant, Vinco Incorporated, interposes a general denial and special defenses to the effect that the plaintiff executed waivers and releases of all of its claims, plaintiff's claims are barred due to its failure to give timely notice as set forth in the contract, and no payments are due the plaintiff because of its failure to provide contractually required documentation. The defendant also interposed a counterclaim to the effect that plaintiff breached the subcontracts in numerous ways. However, defendant has not briefed the issue of its counterclaim and the court deems it abandoned.Jennings v. Reale Construction Co., supra; Johnson v. Flammin, supra. CT Page 1587
The essence of plaintiff's claim is what in the building trade is known as loss of productivity, namely that by the defendant delaying and failing to coordinate the work on the projects which are the subject of this action, the defendant caused the plaintiff to lose a substantial amount of money. The court has bifurcated the case, agreeing first to hear and determine the issue of liability before turning to the issue of damages.
The facts are as follows: On March 30, 1990, the State of Connecticut, Department of Public Works invited sealed bids from general contractors for the construction of a project known as Renovation of North Block and 300 Cell Addition-Cheshire Correctional Facility, Project BI-EE-85 ("Project 85"). This project involved construction of a gymnasium and cafeteria as well as a 300 cell facility. Prior to Vinco, Incorporated (hereinafter Vinco), submitting its bid to the state on Project 85, Herb Holden Trucking, Inc. (hereinafter Holden) submitted a bid to Vinco on June 18, 1990 in the amount of $661,669 for the sitework portion of Project 85. Holden also submitted a similar bid to other contractors who were submitting bids to the state for Project 85. On August 10, 1990, the state awarded the contract for Project 85 to Vinco for the lump sum of $15,672,000.
On April 20, 1990, the state invited bids from general contractors for a project known as 312 Cell Addition, Cheshire Correctional Facility, Project BI-EE-100B ("Project 100B"). Prior to Vinco subcontracting its bid to the state, Holden submitted a bid to Vinco on June 19, 1990 in the amount of $554,850 for the sitework portion of Project 100B. On August 10, 1990, the state awarded the contract for Project 100B to Vinco for the lump sum of $13,130,000.
The state issued an "Order to Commence Work" to Vinco for both projects on August 20, 1990. Under the terms of the general contract between the state and Vinco, Project 85 was to be completed within 460 days or by November 23, 1991 and Project 100B within 510 days or by January 10, 1992. Liquidated damages were to accrue at $1,000 a day if the jobs were not completed by those dates.
On August 17, 1990, Holden offered to do the sitework on both projects, 85 and 100B, for the total sum of $1,238,725. The parties eventually agreed to $1,200,000, a reduction of $38,725 from the price offered by Holden. CT Page 1588
On August 27, 1990, Vinco and Holden entered into subcontracts for Projects 85 and 100B. As to Project 85, the contract price for the site work was $646,546 and for Project 100B it was $553,454. The subcontracts provided as follows.
6. Time of Performance
 a. Subcontractor will proceed with the work in a prompt and diligent manner in accordance with Contractor's schedule as reasonably amended from time to time. TIME IS OF THE ESSENCE. Subcontractor shall be entitled to additional compensation for compliance with schedule amendments only to the extent, if any, that the Contract Documents entitle Contractor to reimbursement. Contractor shall not be liable to Subcontractor for any damages resulting from delays caused by an entity not a part to this Subcontract unless Contractor has first recovered same on behalf of Subcontractor from said entity. Subcontractor expressly agrees that apart from recovery from said entity, Subcontractor's exclusive remedy for delay shall be an extension of the time for performance of the Subcontractor's work.
7. Changes and Claims
 b. Subcontractor shall submit in writing to Contractor all claims for adjustment in the Subcontract price or schedule for which the Owner is liable in the manner provided in the Contract Documents for like claims by Contractor against Owner. Such claims must be submitted by Subcontractor to Contractor at least three days prior to the time Contractor is required by the Contract Documents to submit claims to Owner otherwise such claims shall be waived. Contractor shall process such claims according to the provisions of the Contract Documents and Contractor's liability to Subcontractor for such claims is limited to any adjustment which shall be made by Owner to Contractor's contract on account of Subcontractor's claim.
 c. Subcontractor shall submit in writing to Contractor all claims not included in paragraph 7b within five days of the beginning of the event for which claim is made, otherwise such claim will be waived. All unresolved claims shall be resolved in court of competent jurisdiction.
26. Complete Agreement
CT Page 1589
 This subcontract contains the entire agreement between the parties hereto with respect to the matter covered herein. No other agreements, representations, warranties, or other matters, oral or written, shall be deemed to bind the parties.
The contracts between the state and Vinco contained a portion entitled "General Conditions of the Contract". Article 2, "Conditions of Work", subsection 1 provides:
 1. In carrying out his work, the contractor must employ such methods or means as will not cause any interruption of or interference with the work of any other contractor, nor with the normal routine of the institution or agency operating at the site.
Article 6, "Separate Contracts", subsection 4 provides:
 4. Insofar as possible, the contractor shall arrange his work and shall place and dispose of the materials being used so as not to interfere with the operation of other contractors adjacent to or within the limits of the same project. He shall join his work with that of others in an acceptable manner, and perform it in a proper accordance with that of the others."
Article 7, "Cooperation of Trades", provides:
 "The contractor is responsible for and shall control all activities of his subcontractors, and the subcontractors shall consult and cooperate with one another and the other contractors working on the site in the installation of the work of each."
Article 13.7 provides:
 "If the contractor wishes to make a claim for an increase in the contract sum or for any damages sustained as a result of changes in the work, he shall give the owner written notice thereof within seven (7) calendar days after the occurrence of the event giving rise to such claims. No such claim shall be valid unless the notice is in writing. In addition, the contractor shall file with the owner daily or weekly itemized statements of the details and cost of such work performed or damage sustained as may be required by the owner."
The contracts between the state and Vinco also contained a CT Page 1590 portion entitled "Supplementary General Conditions":
Section 01040, "Coordination" provides:
 "A. Coordinate work of the various sections of specifications to assure efficient and orderly sequence of installation of construction elements, with provisions for accommodating items to be installed later.
Section 01311 "Network Analysis" provides:
 A. General: The contractor shall prepare and maintain a detailed progress schedule as described below. The schedule shall be the contractor's working schedule and used to plan, organize and execute the work, record and report actual performance and progress and show how the contractor plans to complete remaining work. The schedule shall be in the form of an activity oriented network diagram (Critical Path Method). The principles and definitions of the terms used herein shall be as set forth in the Associated General Contractors of America (AGC) publication "The Use of CPM in Construction" Copyright 1976. In the event of discrepancies, this Article governs the development and use of the progress schedule.
Representatives of Holden and Vinco met on August 10, 1990 to discuss Holden doing both jobs. This court finds that the testimony of Holden's witnesses as to that meeting was to the effect that discussions were held on coordination and scheduling of the projects, but that those discussions were more in the nature of Holden's expectations" of how the jobs would progress than an agreement by the parties of a precise schedule. Moreover, Vinco knew about that time, as Holden has conceded in its brief, that Vinco was still negotiating with the state as to the design of the cell blocks for Project 85 and that Vinco also was aware of delays in the installation of the security fence for access to the area within the prison for Project 85, 50 Vinco was in no position in August, 1990 to agree to any precise schedule of the work and it was most unlikely to make such an agreement with Holden.
It is also significant that no schedule agreement, purported to have been reached on August 10, 1990, is referred to in the subcontracts between the parties dated August 27, 1990. Rather, the subcontract provides that the subcontractor "will proceed CT Page 1591 with the work in a prompt and diligent manner in accordance withcontractor's schedule as reasonably amended from time to time."
Also, under the general contract between Vinco and the state, Vinco had sixty days after receiving notice to proceed from the state, to prepare a detailed program schedule. So, again, it is very unlikely that it would have agreed with Holden on August 10, 1990 to proceed pursuant to any fixed schedule on that date.
Thus, the court concludes that Holden and Vinco never entered into an agreement for Holden to start in September, 1990 and conclude excavation and footings for both Projects 85 and 100B by the end of December, 1990.
In September, 1990, Holden did start site clearing and construction of some utilities outside the prison walls in connection with Project 85. However, the work could not proceed inside the prison walls because another general contractor delayed constructing a fence on the south side of the correctional facility so that prisoners could be moved out of the north field where Project 85 was located to open that field for construction. Vinco had no control over this general contractor in connection with the fencing and was not responsible for that delay which lasted from August 20 until October 9, 1990.
After Holden got access to the north field to start laying utilities, it encountered a ledge of rock which required blasting and drilling to remove it for the period from October 24 until November 29, 1990. This rock removal work was the subject of a change order submitted by Holden, accepted by Vinco, and for which Holden was paid the sum of $96,000.
As indicated above, Vinco had 60 days from August 20, 1990 (the date the state gave notice work could begin) to submit project schedules. Vinco delivered a critical path schedule to O G Industries, Inc. (hereinafter O G), the state's construction manager on the projects, on November 26, 1990, and an updated impacted schedule, taking into account delays, on December 11, 1990. The schedules were not given to Vinco's subcontractors, but they were discussed with them at weekly job meetings.
In November, 1990 the state required the relocation of a temporary security fence between the existing dormitory and the location of the new cell block to be constructed by Project 85, and this caused delay in installing sanitary and storm lines in CT Page 1592 this area. Removing the temporary fence also required relocating and installing a fire egress door. This work involved the fabrication of new doors and frames, procurement of masonry concrete blocks to match existing concrete blocks, the wiring of the doors back to central control, and testing for security purposes. Further changes to the location of temporary fencing were issued by the state on November 28, 1990. The revised temporary fence work was completed and accepted by the state on December 17 so the installation of the sanitary and storm sewers could proceed.
Holden should have been able to work on the sanitary lines in the area adjacent to the south security fence as of December 22, 1990. However, it walked off the job because it had not been paid, so it did not start the work until January 9, 1991. At this time there was also a change in the design of the depth of the sanitary line from approximately thirteen feet to approximately five feet. This change actually reduced Holden's work and served to speed up the project. However it was not until sometime between December 27, 1990 and January 9, 1991 that the state authorized the change. Holden then commenced the execution and installation of the sanitary line in the area adjacent to the south security fence on January 9, 1991 and completed that work by January 24, 1991.
In accordance with the phasing requirements for Project 85, the footing excavation work for the gymnasium, which had to be constructed before the new cell block, could not start until after all utilities were installed and operational. Once the security line was completed Holden could begin the removal of existing utilities and footing excavations at the gym. The gymnasium footing excavations began on January 25, 1991 and were completed between February 5 and 7, 1991.
Upon completion of the gymnasium footing excavation work by February 7, 1991, work on the cell block could begin in accordance with the Project 85 phasing requirements. Considerable testimony concerned whether or not a change in the design of the cell block for Project 85 caused a delay in the project. The court finds the following facts on that issue:
Vinco, at the time of bidding upon the project, had relied upon an assumption that the specifications allowed the use of a five sided cell, that is, a precast cell with four walls and a floor. The state's construction manager, O G, took the position that CT Page 1593 the use of a five sided cell was a substitution or change to the contract and therefore the state was due a cost proposal for the difference in the cost between the four sided and five sided cell. This controversy was resolved in favor of Vinco, but a shop drawing submittal process had be gone through and the state further required a third party review of the design. The five sided cell was finally approved by the state in mid January, 1991. Holden then had to back fill old footing excavations Vinco had required dug in November. The new design required widening the excavation for footings, but actually reduced the length of these footings by 650 lineal feet. The new design also eliminated a wall under the cells.
The point, however, is that the approval of the five sided cell occurred before Holden was ready to start the cell footing excavation work on February 8, 1991 and in no way delayed the project. Moreover, the controversy over the five sided cell was not the fault of Vinco, but rather of a misunderstanding engendered by O G.
When Holden did start the excavation of the footings for the cell block for Project 85, in February of 1991, it ran into very severe problems of mud and water. Holden asked to be relieved of doing work in that time of the year but Vinco insisted that it proceed. On some occasions, Holden dug the excavation for footings in expectation that concrete subcontractors would come to pour the concrete and the concrete subcontractors did not appear. This necessitated Holden re-excavating the footings. Although Holden had the obligation under the subcontract to prevent surface water from flowing into excavations and to remove it, Holden could not continuously pump out footings when concrete subcontractors did not appear. Under the conditions at the time Holden also had to add stone and install filter fabric to its excavations in order to keep them dry for the concrete. This added to its cost.
During the work on Project 85, Holden also encountered considerable delays because of checking men and vehicles coming through the security gates. Delays also were encountered by reason of relocating security cameras.
The work progressed on Project 100B much more smoothly. Access to the area of Project 100B was not gained until October 1, 1990. After top soil was stripped, Holden encountered rock on October 3, 1990, which slowed it down but for which it submitted a job CT Page 1594 change order for which it was paid. Holden shifted workers back and forth between the two projects and, although hampered by masons strewing the site with bricks and debris, was able to install the footings and utilities for that project without difficulties. Also, because the site for Project 100B was more accessible, there was not the problems with the security guards.
The cell block excavations were completed on or about May 10, 1991 and the balance of the work on both projects was substantially completed by December of 1992.
In October, 1990, Holden began apprizing Vinco of additional charges that it intended to make for delays. On October 22, 1990, it wrote to Vinco to the effect that there had been a delay from September 28 to October 15, 1990 in obtaining access to the north yard and that this could result in additional charges. On October 23, 1990, Holden wrote to Vinco to the effect that the job was at a standstill and that exposure of the project during adverse weather might slow progress and cause additional charges. On December 28, 1990, Holden wrote to Vinco to the effect that water had accumulated in its excavation of the center core of the main cell building for Project 85 and that its excavation would have to be re-excavated and continually de-watered resulting in an extra due to the untimeliness of footing installation. On July 30, 1991, Holden wrote to Vinco to the effect that it was making a claim for the rock encountered but also it had experienced other losses in productivity and reserved its right to incorporate those additional losses in its claim against Vinco.
In October, 1991, Holden encountered delays in paving the road in Project 100B and on November 5, 1991 gave Vinco "notice that any delay costs incurred as a result of this prolonging of paving will be Vinco's responsibility."
Holden wrote to Vinco on August 6, 1992 to the effect that because of delays of its workers and equipment getting through the main entrance gate it intended to back charge for time loss.
After the bulk of the work on Project 85 and 100B had been completed by December, 1992, on January 29, 1993, Holden made claims against Vinco for change orders not paid for on these projects. As to 100B, these claims included removal of mud, concrete and masonry debris, dealing with rock, and other charges. As to Project 85, they included concrete fabric, stones under footing and other charges. Significantly, Holden made no CT Page 1595 claim for delay or loss of productivity. Vinco responded to Holden on February 17, 1993, accepting some of Holden's claims and rejecting others. Holden replied on February 26, 1993, pursuing its claims on items rejected by Vinco. These claims were not resolved by the time this suit started.
In June, 1993, Holden submitted claim notices to Vinco's surety, National Union Fire Insurance Company of Pittsburgh, PA, amounting to $38,938 for Project 85 and $47,854 for Project 100B. No portion of those claims related to loss of productivity.
From time to time Holden submitted requisitions to Vinco for payments for work done to the date of the requisition. When Vinco paid Holden on these requisitions, it also required Holden to execute a partial release and waiver of mechanics liens. These releases and waivers provided that Holden released and forever discharged ". . . Vinco Incorporated and National Union Fire Insurance Company of Pittsburgh, Pa. ("Surety") . . . of and from all and all manner of action causes and causes of action, suits, debts, sums of money . . . claims and demands whatsoever in law, in admiralty or inequity which against the said Vinco Incorporated . . . said Herb Holden Trucking, Inc. ever had, now has or which it or its successors hereafter can, shall or may have for upon or by reason of any matter cause or thing whatsoever from the beginning of the world to the release date, and especially in connection with any and all claims of any nature whatsoever arising out of the construction project known as" Project 85 and Project 100B. The document also released and relinquished all mechanic's, material man's and like liens on the property and all right's claim Holden had against the Surety Labor and Material Payment Bond provided by Vinco and its surety. The last of these partial releases and lien waivers was dated March 22, 1994 and signed for Holden by its president.
On December 20, 1993, Vinco made its final claim to the state for change orders relating to Project 100B in the amount of $326,363. The basis of these claims was additional time of 441 calendar days spent on the job, extending the original completion date of January 11, 1992 to March 31, 1993 when the Department of Correction first took occupancy. Vinco asserted the entire 441 day delay period was attributable to the state's initiating changes or additions in the work including delaying site access from August 20, 1990 to October 1, 1990, encountering rock, third party review of shop drawings, etc. Vinco did not ask its subcontractors for their delay claims to be submitted to the CT Page 1596 state, relying on the contract documents that required such timely submittals. In June, 1993, Vinco and the state settled Vinco's claims for $240,000, and Vinco was paid that amount. Vinco waived any claim for additional costs on Project 85. The state never made any claim against Vinco for the delay on the job or any claim for liquidated damages pursuant to the contract between the state and Vinco.
The contract between Holden and Vinco provided that Vinco would retain 2 1/2% of the amount due Holden for the work for which it was paid from time to time. When the job was completed, the parties met to discuss the amount of this retainage but the parties never agreed on the amount owed. Holden demanded payment but Vinco has refused until Holden signs a final release and lien waiver.
Holden wrote to Vinco on September 28, 1994 and said it refused to sign the lien waivers "until all issues which remain outstanding including the issues regarding the damages we have suffered due to various project delays caused by Vinco have been addressed to our satisfaction." On August 2, 1994, Holden's attorney wrote to Vinco's attorney to the effect that it was putting Vinco on notice of substantial claims Holden was making due to the failure of Vinco to coordinate the two projects and the delay in the start of Project 85 for several months because of changes in the design of the proposed cell block. This suit was started shortly thereafter in September, 1994.
 I. PLAINTIFF'S CLAIMS
The bases of Holden's claim against Vinco for breach of contract and negligence are: (1) Vinco failed to adhere to an alleged construction schedule that provided for Holden to start in September, 1990 and complete the jobs by December 1990; (2) Vinco caused delay by redesigning the cell block from a four to a five sided pre-cast cell for Project 85; (3) Vinco caused delay by failing to coordinate the work on the two projects.
 1.
In his brief, Holden's attorney rests plaintiff's case that Vinco failed to adhere to a construction schedule on the following oral agreement allegedly entered into by representatives of the parties: "The agreement of the parties, Holden and Vinco, was that the site work would begin September CT Page 1597 4th, right after Labor Day, that Herb Holden Trucking, Inc., would use a crew of men (6 men) with one common group of equipment, do all the site work at Project 85 and move 4 men to Project 100B with all the equipment necessary to do utilities at Project 100B, leaving 2 men at Project 85 to dig footing and back fill all of Project 85. Both Projects as to subgrade work were to be completed by the end of the construction season for 1990 with a restart in the spring of 1991. This start date and schedule is the bench mark by which the Plaintiff seeks to measure its losses. Had this start date and schedule been adhered to, the Plaintiff would have incurred no losses and obtained its profit. But for the Defendant's breach of this condition or promise, the Plaintiff has been injured and seeks damages."
This alleged oral agreement violates the parol evidence rule and, more significantly, is not sustained by the evidence.
The parol evidence rule "prohibits the use of extrinsic evidence to vary or contradict the terms of an integrated written contract." TIE Communications, Inc. v. Kopp, 218 Conn. 281,287-88 (1991). When parties have merged all prior negotiations and agreements in a writing intending to make that the repository of their final understanding, "evidence of such prior negotiations and agreements will not be received to vary or add to the writing." Harris v. Clinton, 142 Conn. 204, 210 (1955);Associated Catalog Merchandisers, Inc. v. Chagnon, 210 Conn. 734,740 (1989). Here, the parties entered into the subcontract which specifically provided that it was "the entire agreement between the parties hereto with respect to the matters covered herein. No other agreements, representations, warranties or other matters, oral or written, shall be deemed to bind the parties."
The court finds the subcontracts to be integrated agreements intending to merge all prior discussions between the parties into the subcontracts themselves.
The subcontract further provided "the subcontractor will proceed with the work in a prompt and diligent manner in accordance with the Contractor's schedule as reasonably amended from time to time." Under the contract documents with the state, Vinco had sixty days to prepare a schedule of the work. Moreover, the state had issued a notice to commence work as of August 20, 1990. While the starting date for Holden to start was not specified in the contract, and that date might be the subject of parol evidence, the entire schedule laid out in the alleged oral CT Page 1598 agreement providing for coordinating the two separate jobs, Project 85 and 100B, and providing for a completion date by December, 1990 were material terms that varied the terms of the subcontract. This violates the parol evidence rule. It is not within the power of the court to make a new or different agreement than the parties expressed in the written subcontract.Collins v. Sears. Roebuck Co., 164 Conn. 369, 374 (1973).
More significantly, the evidence does not support any such agreement being made between the parties. At the meeting of August 10, 1990, representatives of Holden and Vinco discussed coordination of the two projects. Holden's witnesses testified they "expected" that the jobs would be coordinated so Holden could use one crew and finish its site and excavation work by December, 1990. This expectation may even have played a part in Holden's accepting both projects for $38,000 less than its revised bids. But it was only an expectation and not an agreement by Vinco. Even Holden's attorneys, in their letter to Vinco's attorney, written on August 2, 1994, long after the jobs were completed, said "our client's agreement to undertake the site work contemplated that Holden would be able to minimize its manpower and equipment needs through careful coordination between the two projects."
Whatever Holden's expectations may have been, the evidence strongly militates against an agreement between the parties in August, 1990 to fix a schedule of work for Holden that would be completed by December, 1990. Vinco knew in August, 1990 that it was negotiating with the state on the design of the cell block for Project 85 and "was also aware of the likelihood of delays in gaining access to the prison grounds to start Project 85 because the general contractor installing the security fence had not completed his work. In addition under its general contract with the state, Vinco had sixty days after August 20 (when it received notice from the state to start work) to prepare a detailed program schedule. For all these reasons it is highly unlikely that Vinco, in August, 1990, could have promised Holden a firm schedule of work with a completion date of December, 1990.
The subcontract between the parties provided that Holden would proceed with the work "in accordance with contractors' schedule as reasonably amended." Those words implied flexibility in the timing of work as the situation dictated. Holden's alleged oral agreement would eliminate that flexibility from the contract and amount to a guarantee that Holden would not have to excavate in CT Page 1599 the winter of 1990-1991. The court finds no such promise, let alone a guarantee, was ever given by Vinco and it is totally unrealistic for Holden to have believed or acted on it having been given.
 2.
Holden asserts that a major cause of the delay of Project 85 was Vinco seeking to redesign the cell block from four to five sided cells (the Rotunda design). The facts do not support this assertion.
First, there was no re-design. Vinco had made it bid to the state in the belief that the cells for Project 85 would be the Rotunda five sided cells. O G thought this constituted a substitution or change to the contract and required a revision of the cost. The controversy ultimately resolved in favor of Vinco. The state agreed to the Rotunda cells for Project 85 and Vinco agreed that it would not ask for any extension of the contract to install these cells. The state required, however, a process of submitting shop drawings and third party review of the design which was not completed until January 21, 1991. The whole controversy was caused by the misunderstanding of O G. Vinco prevailed on the right to install the Rotunda cells. The time consumed in getting the final approval was the fault of the state.
More importantly, the Rotunda issue did not hold up Holden proceeding with the excavation of the cell blocks on Project 85.
Delays were occasioned by the following: (1) delay from August 20 to October 9, 1990 in getting access to the north field (the site of Project 85) because of the failure of another general contractor to complete the security fence; (2) delay from October 24 to November 29, 1990 on account of Holden encountering rock; (3) a delay in December up to December 21 occasioned by the state requiring the location of temporary security fencing and the fabrication of a new fire access egress door before installing sanitary and storm sewers; (4) delay occasioned by Holden going off the job from December 22 to January 9, 1991; (5) delay from January 9 until January 24, 1991 because the state changed the depth of the sanitary lines; (6) the excavation for the gymnasium which had to be done before the excavation of the cell blocks on Project 85 and which was not completed until February 5, 1991. CT Page 1600
As a consequence, Vinco could not start excavation of the cell blocks until after February 1, 1991. Since the final approval of the five sided cell design was given on January 21, 1991, clearly that issue did not cause any delay to Holden.
 3.
Holden's main claim is Vinco caused considerable delay by failing properly to coordinate the work on both projects.
The contract between the state and Vinco places squarely on Vinco the duty to coordinate the work of its subcontractors. Under "General Conditions", Article VII provides: "the contractor is responsible for and shall control all activities of his subcontractors, . . . ." Under "Supplementary General Conditions", paragraph 01040 provides: "coordinate work of the various sections of specifications to assure efficient and orderly sequence of installation of construction elements, with provisions for accommodating items to be installed later."
Holden's expert witnesses testified that the standard reasonably prudent contractor had to comply with was to "carry on the coordination of all trades on the site for a timely and efficient instruction."
Thus, failure of Vinco properly to coordinate the work on the two projects amounted to either a breach of contract or breach of the common law duty to comply with the standards of the trade and so constituted negligence. In Jennings v. Reale ConstructionCompany, 175 Conn. 16, 21 (1978) our Supreme Court held that general contractor was liable to its subcontractor when the general contractor "failed to prepare properly the job site, to prepare properly and allocate work areas for the plaintiff and to excavate properly and prevent accumulation of water in trenches. . . . It was the responsibility of the general contractor to coordinate the entire project."
Holden, however, asserts its claim of failure to coordinate too broadly. It seeks to hold Vinco responsible for delays to Projects 85 and 100B caused by other general contractors and by the state. Thus, Holden argues Vinco must be liable for Holden not getting access to the Project 85 site until October 9, 1990 due to another general contractor not completing the security fences. The contract between the state and Vinco under General Conditions at Article VI, Subsection 4, required Vinco "not to CT Page 1601 interfere with the operations of other contractors . . . and joined his work with that of others in an acceptable manner and perform it in a proper accordance with that of the others." Vinco, however, had no control over other general contractors. That was the responsibility of the construction manager on the job, O G. As a consequence Vinco cannot be held responsible for those general contractors failing to do their work on time. This delay in getting started on Project 85 was critical because it virtually assured that excavation would begin in the winter of 1990-1991, which was the primary source of Holden's complaint.
The contract between the state and Vinco also provided that Vinco should not cause interference with "the normal routine of the institution or agency operating at the site." This provision highlights a critical aspect of the two projects. The work was being done at a state prison where security concerns were of the highest priority. Delays were not only inevitable but anticipatable in dealing with those concerns. Men and vehicles backed up at entrances and sally ports of the prison for inspection; sanitary and storm sewer installation that impinged upon interior security fencing had to await the reconstruction of those fences; security cameras had to be relocated and fire egress doors built. These delays cannot be the responsibility of Vinco but were indigenous to work being done at a prison.
Finally, the state itself caused delays. It issued changes to the temporary fencing and fire egress doors that directly delayed the progress of Holden's work on site utilities and delayed the approval of the re-designed sanitary line. Our Supreme Court inWexler Construction Company v. Housing Authority, 149 Conn. 602,605 (1962) stated, "a contractor is not necessarily, nor even generally liable to its subcontractor for the extra work done by the subcontractor by reason of fault on the part of the owner or his agents."
However, Holden is correct that Vinco is liable for failure to coordinate its own subcontractors on the job. Project manger of O G testified to delays caused by lack of supervision on the part of Vinco, lack of coordination of its subcontractors, inadequate number of site managers and lack of adherence to a logical schedule.
The most glaring example of this is when Holden dug excavations for footings for the Project 85 cell block in February of 1991, Vinco failed to have the cement subcontractors promptly pour the CT Page 1602 footings. This necessitated excavations being done several times over by Holden at deeper levels with additional stone. Also, when the concrete people did not appear on schedule, Holden had to find make-work jobs for its men. When the concrete subcontractors did not remove concrete blankets, Holden's employees had to do that job.
When in August, 1991 Holden laid down a base coat of asphalt for the parking lot, for several months it had to clean it from the rubble and waste of the other subcontractors, repair damaged storm drains, clean out storm culverts, repair paving dug up by fence contractors, re-excavate sewer lines under roads already installed.
Between April, 1991 and December, 1992, Holden graded and seeded the site. However, that work was continuously destroyed by other subcontractors, necessitating Holden returning to repair those areas.
Thus the court finds that Holden has proven the liability of Vinco in breach of contract and negligence for delays caused by Vinco's failure to coordinate its subcontractors.
 II. DEFENDANT'S DEFENSES 1.
Vinco asserts the defense that Holden's claims are barred by its failure to comply with the notice of claims provisions of the contract documents.
The subcontracts provide at Article 7b and c:
Changes and Claims
 b. Subcontractor shall submit in writing to Contractor all claims for adjustment in the Subcontract price or schedule for which the Owner is liable in the manner provided in the Contract Documents for like claims by Contractor against Owner. Such claims must be submitted by Subcontractor to Contractor at least three days prior to the time Contractor is required by the Contract Documents to submit claims to Owner otherwise such claims shall be waived. Contractor shall process such claims according to the provisions of the Contract Documents and Contractor's liability to Subcontractor for such claims is CT Page 1603 limited to any adjustment which shall be made by Owner to Contractor's contract on account of Subcontractor's claim.
 c. Subcontractor shall submit in writing to Contractor all claims not included in paragraph 7b within five days of the beginning of the event for which claim is made, otherwise such claim will be waived. All unresolved claims shall be resolved in court of competent jurisdiction.
The general contract between the state and Vinco provides at Article 13.7 "General Conditions": "If the contractor wishes to make a claim for an increase in the contract sum or for any damages sustained as a result of changes in the work, he shall give the owner written notice thereof within seven (7) calendar days after the occurrence of the event giving rise to such claims. No such claim shall be valid unless the notice is in writing. In addition, the contractor shall file with the owner daily or weekly itemized statements of the details and cost of such work performed or damage sustained as may be required by the owner.
Reading together these provisions of the general contract and of the subcontracts, Article 7b of the subcontracts clearly relates to claims Holden had against Vinco that Vinco had against the state. These would include claims of Holden and Vinco that the state caused delays, such as inability to gain access to the Project 85 site due to the uncompleted security fencing of the south field, and also Holden encountering rock. In fact, Vinco made precisely such claims against the state and they were resolved in the final settlement between the state and Vinco. Article 7b provides that Holden's claims of that nature had to be submitted to Vinco in writing three days before Vinco was required under the general contract to submit such claims to the state, which was seven days after the occurrence of the event giving rise to such claims, and they must consist of details and the costs of damage sustained. Article 7b provides that if Holden did not submit such claims to Vinco within that time frame and in that manner, such claims were waived and Holden could not recover against Vinco for them.
The evidence is clear that Holden wrote to Vinco on October 22, 1990 that the delay in obtaining access to the Project 85 site would result in additional charges; on July 30, 1991 that it was making a claim for rock encountered and other losses of productivity; on August 6, 1992, that it intended to back charge CT Page 1604 for time losses due to the delays of its workers and equipment getting through the main entrance gate. However these letters lacked the details and costs of such damages sustained as required by the contract documents. By failing to comply with the notice of claim provisions of those documents they must be deemed waived.
The court has frequently denied claims by subcontractors against general contractors when the subcontractors have failed to comply with contractually-mandated notice requirements. InCocchiola Paving Inc. v. Burlington Construction Co., Inc., CV 960133664, Superior Court, Judicial District of Waterbury, (Kulawicz, J. April 1, 1988), the subcontractor entered into a contract with the general contractor containing the following provisions: "In the event the subcontractor claims any work directed to be performed by it involves extra or additional work, it shall within three (3) days after receipt of such direction . . . make written claim therefore giving in detail the basis of its contention and a detailed break down showing separately additional costs of labor and material . . . Failure to make written notice of claim within the time and the manner herein provided, shall constitute a waiver therefore and no recovery therefore can be had."
In denying the subcontractor's claim, the court held:
"Clearly the plaintiff did not comply with contract provisions for claiming extra work, never having submitted costs plus fifteen percent figures, nor did he do so at trial. In Section 11, the contracts set forth time limitation in which extras were to be claimed. These also were not complied with by the plaintiff. That section also provided that `failure to make written notice of claim, of extra work, within the time and in the manner herein provided shall constitute a waiver therefore and no recovery shall be had.'"
In Associated Mechanical Contractors v. Eby Construction,983 F. Sup. 1121 (M.D. Ga. 1997), where the subcontract clause provided the subcontractor must file a claim in writing with the contractor within ten days from the commencement of the alleged damage and a full accounting filed within ten days after the extent of the damage is known, the court found against the subcontractor for failing to comply with these requirements even though it had submitted ten letters relating to delays involved with the project. CT Page 1605
In Allgood Electric Co., Inc. v. Martin K. Eby ConstructionCo., Inc., 959 F. Sup. 1573 (M.D. Ga. 1997), where the subcontract required the subcontractor to provide written notice of claim within fifteen days after the occurrence of the event on which the claim is made and a full accounting of the extent of the damage known, the court held that the subcontractor's claim was precluded because of its failure to comply with its contractual duty.
Thus, this court concludes that, pursuant to Article 7b, claims that Holden had against Vinco and Vinco had against the state, are precluded by Holden failing to comply with the time and, particularly, the manner of detailing the cost of these claims.
Article 7c of the subcontract relates to claims Holden has against Vinco which Vinco cannot pass on to the state. These would include Holden claims for Vinco' s own breach of contract or negligence for failing to coordinate its subcontractors or otherwise cause delays on the projects. As to such claims, 7c provides Holden shall submit those in writing to Vinco within five days of events for which the claims are made. No mention is made of the form of the claims or of requirements as to details and costs. Article 7c does not incorporate by reference Article 13.7 of the general contract. Vinco could have required that subcontractor claims state details, amounts of loss and other specifics but it did not. Vinco drafted the subcontracts and the provision relating to notice of claim must be construed against it. Therefore, this court concludes a simple notice of a claim with the basis for it satisfies Article 7c.
The facts are that Holden wrote to Vinco on October 23, 1990 to the effect that the job was at a standstill and the exposing of the project to adverse weather may cause additional charges. On December 28, 1990, Holden wrote to Vinco to the effect that water had accumulated in its excavation of the center core of the main building for Project 85 and the excavation would have to be re-excavated and continually de-watered resulting in an extra due to the untimeliness of footing installation by other of Holden's subcontractors. On November 5, 1991 Holden wrote to Vinco to the effect that paving on Project 100b on the west side was delayed due to a conflict with a fence subcontractor and vast amount of garbage and debris, and served notice that "any delay costs incurred as a result of this prolonging of paving will be Vinco's responsibility." On November 5, 1991, Holden also wrote to Vinco CT Page 1606 to the effect that a mason subcontractor was holding up the job, and that Vinco would incur back charges for 1992 paving prices and Vinco was responsible for the lack of continuity between subcontractors' scheduling.
The court finds these letters complied with the notice of claim requirements of Article 7c and Holden is not barred from asserting such claims by that Article.
 2.
Vinco asserts the further defense that Holden executed releases of its claims against Vinco that bars Holden from recovering.
In the course of the job Holden submitted requisitions for payment for work done from the date of the requisitions. When Holden was paid, it signed a partial release, waiver of mechanic's lien and waiver of payment of bond rights in favor of Vinco and its surety. The releases provided that Holden acknowledged payment for all labor and materials and service up to and including the release date, released and discharged Vinco and its surety from all matter of action, contracts, damages, claims and demands whatsoever which Holden had from the beginning of the world to the release date and especially in connection with claims arising out of Projects 85 and 100B. The lien waiver provided Holden waived, relinquished and released any mechanic's, material man's or like liens upon land or building at Projects 85 and 100B. The waiver of bond rights especially waived and relinquished any claims Holden had under the Surety, Labor and Material Payment Bond.
As to Project 85, the last such release and waiver was signed by Holden as of the release date of October 31, 1992 and as to Project 100B as of the release date of February 28, 1994.
In this action as to Project 85, Holden's claims against Vinco are based upon delays due to the failure of Vinco to coordinate the work occurring mainly during the winter of 1990 and 1991 but not beyond October, 1992. As to Project 100B, Holden claims against Vinco are based on delays due to the failure of Vinco to coordinate the work occurring up to and through 1993. The releases given by Holden for these projects covered these periods of time. Holden never sought nor was given any exception from the releases for its productivity losses that are the subject of this suit. As a consequence, the releases bar Holden from recovering. CT Page 1607
There is ample authority that our courts give such effect to voluntarily executed, clearly phrased releases and lien waivers. In Wayne J. Griffin Electric, Inc. v. Dunn Construction Co.,622 So.2d 314 (Ala. 1993) when each subcontractor submitted applications for partial payments, it was required to sign a document labeled "Application for Payment and Partial Release of Lien." The releases and lien waivers were almost identical to the language in the releases and lien waivers in the case before this court. After completing their work and signing releases but prior to receiving the final payment, subcontractors filed claims against the general contractor for increased costs incurred as a result of delay. The court held in Wayne J. Griffin Electric,Inc. v. Dunn Construction Co. that the releases referred to all claims of any nature relating to the project including claims for delay damages. Since the subcontractors had signed the releases after incurring the alleged delays, the claims were barred.
The court said "The plain and ordinary meaning of the words in the releases executed by the subcontractors is to relieve Dunn and The Authority from `any and all claims' the subcontractor may have that in any way relate to the construction `from the date of execution of (the release).' If the parties had intended to limit the release, they could have specifically done so. However, having not expressly limited the releases, the subcontractors cannot now assert an intent not found within the four corners of the document." (at 317.)
In Kav-R Electric Corp. v. Stone and Webster Construction Co.,Inc., 23 F.3d 55 (2d. Cir. 1994) an electric subcontractor sued a general contractor claiming that it completed its work 11 months later than scheduled because of the general contractor's failure to perform its work on time. However, as part of each requisition for payment, the subcontractor released the general contractor "from any claim or claims or whatever nature for materials furnished, labor performed or expenses incurred to date . . ." No requisition made any claim for delay damages.
The plaintiff subcontractor in Kav-R-Electric argued that its delay claims, caused by the defendant general contractor's mismanagement and inefficient work force, were outside the scope of the partial releases and there was no place on the periodic requisitions to state them. The court was unpersuaded, noting that the subcontractor could have expressed an exception for its delay claims in the partial releases, and that the language of CT Page 1608 the releases covering any claims "of whatever nature for labor performed or expense incurred to date" was clear, unambiguous and barred the subcontractor's delay claims.
In Pero Building Co. v. Smith, 6 Conn. App. 180 (1986), where the contractor expressly agreed "that no mechanic's lien or liens will be filed or maintained by the contractor against the dwelling or other improvements to be constructed or against the property", the Appellate court held that the failure of the trial court to grant the discharge of the contractor's mechanic's lien was erroneous. It said, "We conclude that because of the language of the agreement between the parties was clear and definitive, and because intention of the parties was unmistakable, the trial court could not reasonably construe such language as other than a voluntary and absolute waiver of the plaintiff's statutory right to file a mechanic's lien on the Smiths' property." (at 184-85).
Similarly, in Snydergeneral Corp. v. Lee Parcel 6 Associates,Ltd. Partnership, 43 Conn. App. 32 where an agreement between a contractor and subcontractor provided that "the subcontractor does hereby waive and relinquish its right to any and all liens or claims of liens as may be permitted or provided for by any provision of law" the court gave effect to that clear and unambiguous language to discharge the subcontractor's lien filed on the property.
Thus, this court concludes that these releases bar Holden from recovering on the loss of productivity claims that is it the subject of this action.
However, the releases do not bar Holden from pursuing the claims for change orders which it submitted to Vinco in February, 1993 and were the subject of discussions between the parties through February 26, 1993. This was an ongoing dispute between them which the court finds neither party intended would be precluded by the aforementioned releases. Likewise, Holden' s claim for the 2 1/2% retainage that Vinco held from each partial payment to Holden, is not barred by the release. Clearly, that issue is also an ongoing dispute between the parties that the court finds was never intended to be resolved by the releases. Moreover, Vinco indicated at trial that it would pay that retainage, provided Holden executed the appropriate release and lien waiver.
Accordingly, the court enters an order denying Holden's claim CT Page 1609 for productivity losses except for its claim for compensation for unpaid change orders, as revealed in Exhibits G, H and I, and for its claim for retainage. These latter items may be the subject of the continuation of this bifurcated trial to determine the damages Holden is entitled to before the entry of final judgment.
Robert Satter Judge Trial Referee